This case was originally filed as an asbestosis claim in 1989 and was heard before Deputy Commissioner Jan Pittman in Manteo on October 7, 1991. The claim was subsequently dismissed voluntarily and an Order was entered giving plaintiff one year within which to re-file. Within that period, the plaintiff filed a new asbestosis claim in February, 1994. In May, 1995, following a new diagnosis, he filed a claim alleging that his lung disease was the result of exposures to asbestos and other substances, including specifically oil mist in his employment with the Department of Transportation.
The parties agreed to stipulate the transcript and other evidence from the earlier proceedings, as well as a large quantity of medical records, into the record in the current proceedings.
Subsequently, the case was assigned to Deputy Commissioner Shuping, who left the Commission before the record could be completed in the case. The case was reassigned to Deputy Commissioner Amy Pfeiffer. The parties took the depositions of Dr. Gary Greenberg, Dr. D. Allen Hayes, Dr. Victor Roggli and Dr. Victor Tapson.
The Full Commission has reviewed the prior Opinion and Award based on the record of the proceeding before the deputy commissioner. The appealing party has shown good ground to reconsider the evidence. Upon reconsideration of the evidence, the Full Commission reverses the Opinion and Award of the deputy commissioner and enters the following Opinion and Award:
The Full Commission finds as fact and concludes as matters of law the following which were agreed upon by the parties as:
 STIPULATIONS
1. It is stipulated that all parties are properly before the Industrial Commission and are subject to and bound by the provisions of the Workers' Compensation Act; that the Commission has jurisdiction over the parties and of the subject matter and that the employer-employee relationship existed between plaintiff and defendant-employer.
2. It is stipulated that all parties have been correctly designated and there are no questions as to misjoinder or non joinder of the parties.
3. It is stipulated that all carriers have been correctly designated and the North Carolina Department of Transportation was self-insured at all times relevant hereto.
4. The parties stipulated that the plaintiff was employed by the defendant in Hertford, Manteo and Mann's Harbor from 1968 to 1985 and the Form 22 may be used to calculate the applicable average weekly wage.
5. The transcript and medical records from prior proceedings are stipulated into the record of this case.
 *********** EVIDENTIARY RULINGS
The objections appearing in the depositions of Dr. Hayes, Dr. Tapson, Dr. Greenberg and Dr. Roggli are OVERRULED.
 ***********
Based upon all the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Mr. Percy Edward Hunter, now deceased, was 54 years old at the time of the hearing on October 7, 1991 before former Deputy Commissioner Jan Pittman and had completed the tenth grade. He had obtained his GED when he was 48 years old. For most of his working life, from 1955 until 1985, Mr. Hunter worked in various locations, doing service and mechanic work on motor vehicles.
2. Mr. Hunter worked for the defendant from 1968 until 1985. His average weekly wage, based on the Form 22 wage chart was $274.81, which yields a weekly workers' compensation rate of $183.22.
3. From 1968 to 1975, Mr. Hunter worked in a large garage in Hertford, N.C., doing repairs on all kinds of equipment, including large motor graders and other kinds of trucks and equipment. From 1975 to 1981 or so, he worked at the Manteo Equipment Shop, a state maintenance facility in Manteo. In Manteo, he was a working supervisor and he worked on loaders, bulldozers, tugboats, tar kettles, boiler machines, dump trucks, ten-wheels, tractors and trailers and any other kind of large equipment the state had.
4. From Manteo, he went to another state facility in Mann's Harbor, where he worked as Equipment Supervisor until he stopped working for the state in 1985. In Mann's Harbor, he worked with the mechanics on ferries and in the machine shop. In that job, the men were running a huge lathe and constantly spraying the big ferry shafts (some were nine feet, some were three), while turning them in the lathe. In addition to working on ferries, he also worked on dredges and tugs and on the shafts, engines and clutches of those vessels. There was also a lot of dust from sandblasting and from removal of asbestos from the boats.
5. During his work for the defendant, Mr. Hunter was exposed almost daily to airborne dust and greasy mist from blowing out brake drums and other parts with a compressed air hose and from the constant washing and spraying, by him and others in the facility, of oil and oily mixtures on the vehicles and equipment.
6. The dusts and mists contained asbestos, motor oil and other petroleum products like varsol or paint thinner that were used on a daily basis to clean and lubricate the pieces of equipment and parts.
7. Mr. Hunter never wore masks or other respiratory protection while doing mechanic work; he did recall seeing some masks around during the last year or two that he worked for the state, but not before then. Even then, the little paper masks which were available were used primarily by the painters and welders, not the mechanics.
8. Mr. Hunter testified and the Commission finds as fact that he used a compressed air hose to blow off machinery and "black dust" would get in his nose and mouth and traces would remain for two to three days. After defendant-employer stopped using compressed air to clean oily dust and grease from machinery in the early 1980's, Mr. Hunter continued to clean large machinery and equipment by spraying it with varsol chemicals.
9. Mr. Hunter had a history of having smoked cigarettes starting at age eighteen or nineteen, off and on for ten to fifteen years. He had not smoked for many years before the hearing.
10. Mr. Hunter lost his job working for the state when he was convicted on one count of embezzlement and was sentenced to pay a small fine and unsupervised probation. He was not physically unable to work until about three years later, in 1988, after he sought treatment from Dr. Shaw about his breathing difficulty.
11. The medical records show that Mr. Hunter had reported occasional breathing difficulties as far back as 1975. In the early 1980's, the state took x-rays on him, once in Manteo and once in Mann's Harbor. At the time, he was told that he had some scarring on his lungs and his family doctor mentioned the possibility of asbestosis.
12. The defendant's witness, Warren Creef, an administrative assistant with responsibility for paperwork on the facilities in Manteo and Mann's Harbor, recalled the x-rays were done in 1983 or 1984, as well as earlier. The state recognized the risks of illness from workplace exposure to asbestos, silica and chemicals in the type of work performed by Mr. Hunter.
13. After the 1983 or 1984 x-ray, Mr. Creef said that his office had received a letter from Mr. Hunter's chest x-rays, indicating that they had an abnormal "haziness".
14. The first doctor that told Mr. Hunter that he had a work-related lung condition was Dr. Shaw, who told him on March 18, 1988 that he had asbestosis.
15. Dr. Robert Shaw saw him in March 1988 and took a sample of lung tissue for a biopsy. Dr. Shaw also put Mr. Hunter on oxygen at that time and he remained on oxygen from that time until his death in 1995.
16. Although Mr. Hunter did work a little after he left the employ of the state, he was totally unable to perform any work for wages after Christmas of 1987.
17. The records of plaintiff's treating physician, Dr. D.O. Wright, were stipulated and show that Mr. Hunter had several bouts of bronchitis in the 1970's and 1980's; that on or about February 1, 1983, he had "spots on his lungs" and that he was working around asbestos and some kind of grinding compound. From that point forward, the records reflect more frequent complaints of shortness of breath. On February 18, 1988, Mr. Hunter had severe shortness of breath which had not improved since Christmas. When his condition had not improved by February 29, 1988, Dr. Wright referred Mr. Hunter to Dr. Shaw, a pulmonologist in Greenville.
18. After ordering an open lung biopsy in March, 1988, Dr. Shaw made a diagnosis of interstitial fibrosis, which he thought at the time was asbestosis. The samples were reviewed by Dr. Roggli at Duke, who found the asbestos content of the samples "unremarkable" and concluded that the diagnosis was idiopathic (cause unknown) pulmonary fibrosis.
19. In the meantime, Mr. Hunter's claim based on asbestosis was filed and he was sent to Dr. Allen Hayes for an examination by the Advisory Medical Committee. That examination was in November, 1988 and the report was released in October, 1990. Dr. Hayes was of the opinion that although Mr. Hunter had all of the clinical indications of asbestosis, including occupational exposure, fibrosis on x-ray, crackling rales, pronounced clubbing of the fingernails and severe restrictive lung impairment; the diagnosis of asbestosis could be excluded because of the absence of asbestos particles in the biopsy sample.
20. In 1993, Mr. Hunter voluntarily withdrew his claim for workers' compensation based on asbestosis. Mr. Hunter did not have asbestosis.
21. In 1992, Mr. Hunter was sent to Duke University Hospital to be evaluated for lung transplantation and in October, 1994, Mr. Hunter underwent a transplant of his left lung at Duke University Hospital. Dr. Victor Tapson, chief of the transplant unit at Duke, was involved in treating Mr. Hunter from that time until his death in September, 1995.
22. After Mr. Hunter's left lung was replaced, his old native left lung was analyzed by the pathologists at Duke, who found that he had interstitial fibrosis with chronic inflammation and honey-comb changes. In addition, they found "lipoid pneumonia manifested by frequent cholesterol granulomas and "intraalveolar accumulation of variable-sized lipid [oil] droplets within macrophages." In the report, the pathologist raised for the first time the question of whether the underlying lung disease might be due to breathing in of oil of some kind.
23. Dr. Tapson wrote a letter in April, 1995, in which he stated that Mr. Hunter had sprayed fuel oil/10W motor oil on equipment from 1968 until several years ago and stating that he thought it possible that the spraying contributed to his lung disease.
24. Based on this new diagnosis, Mr. Hunter filed a new claim for workers' compensation in May, 1995, alleging that his disease was due to exposure to oil mist, as well as dust in his employment with defendant-employer.
25. In his deposition July 23, 1998, Dr. Tapson gave his opinion that Mr. Hunter had "exogenous lipoid pneumonia. . . . caused by something inhaled." Based on the history that Mr. Hunter gave him, as corroborated in the letter Mr. Hunter wrote January 9, 1995, as well as the analysis of the removed lung, Dr. Tapson's opinion was that Mr. Hunter's exposure to oil mists at work was the only factor in his history to have caused the lipoid pneumonia. He explained the difference in the 1994 pathology report and the 1988 report as being because the 1988 biopsy was a very small sample, compared to the analysis of a whole lung in 1994 and to the fact that in 1988, the doctors were looking for asbestosis.
26. Unfortunately, the 1988 pathology samples have disappeared from Pitt Memorial Hospital.
27. Dr. Tapson disagreed with the opinion expressed by Dr. Roggli in a letter to defendant's attorney dated May 23, 1997. In his letter, Dr. Roggli indicated that he thought the lipoid pneumonia was superimposed on the fibrotic lung disease and not the cause and that the source of the lipid was something exogenous. Dr. Tapson pointed out that Dr. Roggli had noticed lipid droplets in "nearly every section" of the sample and that he [Dr. Tapson] was in a better position than Dr. Roggli to express an opinion on causation because of having a much larger sample — i.e., the whole lung. Even Dr. Roggli recognized that these questions should be asked to the clinician.
28. The Full Commission gives greater weight to the opinions of Dr. Tapson because he was in a better position than Dr. Roggli to express opinions on causation, because he was a clinician treating Mr. Hunter and because the entire lung was available as a sample for his review. As such, Dr. Tapson based his opinion upon a history of exposure obtained from the patient and from looking at the whole lung. He also noted that Dr. Roggli himself had initially stated in the 1994 pathology report that some inhaled lipids could have been the cause of Mr. Hunter's underlying lung disease.
29. The defendant hired Dr. Gary Greenberg, an expert in occupational medicine at Duke Occupational Health, to consult and testify in this matter. Dr. Greenberg identified three criteria for a diagnosis of lipoid pneumonia: 1) pathological evidence of tissue changes showing lipoid pneumonia, 2) a history of significant exposure to oil mists, and 3) evidence that the fatty deposits suggest exogenous lipoid.
30. Before his deposition, Dr. Greenberg had not seen the November, 1994 pathology report. Upon reviewing it, he acknowledged that the report showed changes of lipoid pneumonia and if he assumed a history of oil mist exposure, that would very much support the diagnosis of exogenous lipoid pneumonia. Dr. Greenberg further stated that there is a well-known connection in the medical literature between lipoid pneumonia and interstitial fibrosis and that there were connections in studies of various types of mechanics. Dr. Greenberg also opined that if Mr. Hunter was exposed to aerosols of petroleum products at work, that would certainly have increased his risk of developing lipid pneumonia.
31. Based on this new diagnosis, the parties went back and deposed Dr. D. Allen Hayes, who had seen Mr. Hunter in 1988 and who is a pulmonary specialist. Dr. Hayes was of the opinion that, if there is no other history of oil exposure besides Mr. Hunter's occupation, that it would be his opinion that the occupational exposure was more likely than not, the source of his lipoid pneumonia and the interstitial fibrosis. Dr. Hayes was also of the opinion and the Full Commission finds as fact that Mr. Hunter's exposure to oil mists at work was the source of his inhaled exogenous lipid and contributed to the development of his pulmonary fibrosis and that the treatment for his fibrosis, including the transplant and immunosuppression medication, most likely caused the cancer that Mr. Hunter developed in his native right lung and which resulted in his death.
32. Mr. Hunter contracted lung cancer as a direct result of the immunosuppressant treatment he received for his exogenous lipoid pneumonia and resulting interstitial fibrosis.
33. The lung cancer that Mr. Hunter contracted as a result of the treatment of his exogenous lipoid pneumonia and resulting interstitial fibrosis, caused his death on September 1, 1995.
34. Mr. Hunter's occupational exposures to oil mists and oily dust while in the defendant's employ caused his lung condition to degrade to the point of being unable to earn wages as of Christmas 1987.
35. Due to his interstitial lung condition caused by his occupational asthma, Mr. Hunter was totally disabled from December 25, 1987 until his death September 1, 1995.
36. Based on the greater weight of the evidence, the Full Commission finds that Mr. Percy E. Hunter's exposure to oil sprays and mists, as well as dusts, including airborne, pressure-blown oil dust, in his employment with the defendant was a significant contributing factor in the development of his exogenous lipoid pneumonia and interstitial fibrosis and that his treatment for these conditions caused his lung cancer and subsequent death.
37. Based on the greater weight of the evidence, including the opinion of Dr. Greenberg and Dr. Hayes, to a lesser extent, the Full Commission finds that Mr. Hunter's job as a mechanic with defendant-employer where he used compressed air to blow oil dust, oily dirt and other oily substances from large pieces of machinery and where he was constantly exposed to airborne, sprayed oil mist used in cleaning large equipment in enclosed spaces placed him at an increased risk over the general public for contracting exogenous lipoid pneumonia and interstitial fibrosis over members of the general public not so employed. The general public, not so employed, would not be exposed to airborne, pressure-blown oil dusts, oil sprays and other airborne oil substances almost daily and in such an amount for such a long duration of time as Mr. Hunter. Since exogenous lipoid pneumonia is a rare or uncommon disease that is difficult to diagnose without studying a removed lung, the absence of a significant number of documented cases in the literature of exogenous lipid pneumonia and interstitial fibrosis contracted by mechanics does not preclude a finding of causation and increased risk in this case.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. The plaintiff's decedent, Mr. Percy E. Hunter contracted exogenous lipoid pneumonia and interstitial fibrosis, as a result of his exposures and inhalation of mists and oil dusts in his employment with defendant.
2. Mr. Hunter was last injuriously exposed to the hazards of this disease while in the employ of the self-insured defendant-employer; therefore, defendant is liable for the occupational disease. N.C. Gen. Stat. 97-57.
3. As a result of his occupational disease, Mr. Hunter was totally unable to earn wages in any employment continually since December 25, 1987. As of the time of his death, he was entitled to benefits for total disability at the rate of $183.22 per week, from December 25, 1987 until his death September 1, 1995. N.C. Gen. Stat. 97-29.
4. Mr. Hunter was entitled to have the defendant pay for medical treatment for his occupational disease to the extent that it was designed to effect a cure, give relief, or lessen his period of disability. N.C. Gen. Stat. 97-25; 97-59.
5. The plaintiff, Mrs. Hunter, is entitled to an award of death benefits in the amount of $183.22 per week for 400 weeks from September 1, 1995; she is also entitled to an award of $2,000.00 to help defray the costs of funeral expenses incurred upon the death of Mr. Hunter. N.C. Gen. Stat. 97-38.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
 AWARD
1. The defendant shall pay workers' compensation benefits which were owed to Mr. Hunter for his disability to the plaintiff, as the personal representative of the estate of Mr. Hunter, in the amount of $183.22 per week from December 25, 1987 to September 1, 1995. Since all of this amount has accrued, it shall be paid in a lump sum, subject to an attorney's fee hereinafter awarded; N.C. Gen. Stat. 97-37.
2. The defendant shall pay death benefits to plaintiff, widow of Mr. Hunter, in the amount of $183.22 for 400 weeks from September 1, 1995; such amounts as have accrued shall be paid in a lump sum, subject to the attorney's fee hereinafter awarded.
3. An attorney's fee in the amount of 25% of the accrued compensation shall be paid directly to the plaintiff's attorney.
4. The defendant shall pay all unpaid medical expenses and reimburse the plaintiff for all past treatment related to Mr. Hunter's occupational disease, when such medical bills have been submitted and approved by the Commission.
5. The defendant shall pay to the plaintiff the sum of $2,000.00 to help defray the costs of Mr. Hunter's funeral. N.C. Gen. Stat. 97-38.
6. The defendant shall pay the costs due this Commission.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/_____________ THOMAS J. BOLCH COMMISSIONER
DISSENTING:
S/_______________ DIANNE C. SELLERS COMMISSIONER
BSB:md